We'll hear argument first this morning in Case 18-565, CITGO Asphalt Refining Co. v. Frescati Shipping Co. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. The basic issue in this case is what ought to be the default rule for what is the generally referred to as safe port or safe berth clause in the standard Charter Party form that has, frankly, governed the transportation of ocean-going vessels for a very, very long time. There are – the Court below concluded that, based on the language referring specifically to staying afloat and safely, that this imposed a strict liability on the charterer, my client, who designated that Paulsboro, New Jersey, would be the port of entry for these particular goods. That is an extraordinary interpretation under the circumstances in which my client is now facing, well, in excess of $140 million in an award based solely on an accident that was, candidly, unknown and unknowable at the time that the designation was made, and, candidly, at any time until the actual elision occurred. The question, then, is, is there a different or better or more sensible default rule that the Court might turn to? And it seems worth spending a second and just focusing on the exact language of this clause, which is at the appendix to the Petitioner's Brief at 8A. The vessel shall discharge at any safe place or wharf. That, of course, says nothing about any obligations of any of the parties, which shall be designated and procured by the charterer. So that is the obligation of my client, to designate and procure the space, provided that the vessel can proceed thereto, lie at, and depart therefrom always safely afloat, any literage being at the expense, risk, and peril of the charterer. And it seems to me the difficulty with saying that this is an unlimited source of liability on a strict liability theory is that why would you identify literage as the specific remedy to be worried about, unless what you're really concerned about is, has the charterer made essentially a safe choice, as far as everyone can tell, and then when the captain gets there, if for whatever reason the captain, in his or her judgment, decides it's not a safe choice and decides to go off into another port or to offload some portion, that the expense and the risk, all of that is then imposed upon the charterer. Ginsburg. Mr. Phillips, this has been the rule for some time in the Seventh Circuit, in the Second Circuit, including an opinion by Henry Friendly. And isn't this something that the parties can adjust to? If you know what the rule is, they can adjust to it and ensure accordingly? That's — that is precisely what the Court said about Norfolk Southern v. James Kirby in terms of how do you interpret the contract. Obviously, it will always be possible to write around whatever the contract interpretation has to be, but the Court still has the fundamental obligation to determine what should be the default rule. And while it is true that there was — that there's certainly been a period of time when the Second Circuit adopted a broader construction of this clause, it is equally true that for almost 30 years, the Fifth Circuit has adopted precisely the opposite construction of this clause, and Gilmour and Black, for more than 40 years, 50 years, have adopted a fundamentally different construction of this clause. Contrary to the other treatises. But there is another clause that is adopted in some charter parties, and it's called — what is it called? The due diligence clause. So if that clause — that clause would be unnecessary under your reading, because you say that's all that the safe birth clause required. So all of these charters that have been adopting the specific language of due diligence, they're doing — they've done something that's entirely unnecessary. The — the difficulty, I think, with looking at other forms and other clauses and other parties is, candidly, there's no evidence that ties any knowledge of any of that to the decision that was made between the star tanker and my client when they entered into the — into the charter party arrangement in this particular case. It's true that there were other options available, but the question is, what did the parties intend when they chose this language under these circumstances and against the backdrop? Because I do think the text itself tells you that the basic problem this is designed to deal with is, what do you do when you show — when you pick a place that's safe, it turns out it's not safe, and then the — and the captain has to act in response to that. What's the — what's the outcome? But if you put it contextually and look at other provisions of this contract, we have the general exceptions clause that says that the — that for perils of the sea, neither the charterer nor the owner of the ship nor anybody else is responsible for those kinds of injuries. And so that suggests to you that for what we're looking at, unknown and unknowable hazards, that that's — that that's not what the parties expected would be imposed on the charterer by simply designating at the time a safe port. Second — Kagan. Mr. Phillips, even if we're looking just to this contract, these parties, you said, well, look, there is the Second Circuit, but we have the Fifth Circuit on our side. But this contract actually seems pretty well-oriented to the Second Circuit. So there is a arbitration provision in the contract which says that any and all differences and disputes of whatever nature shall be put to arbitration in the City of New York or in the City of London. And then there is another provision in the contract, a jurisdiction clause, which says that disputes concerning non-delivery or damage to cargo may be submitted for adjudication to the United States District Court for the Southern District of New York. So every time that this contract says something about where it expects disputes to go, it points to New York. Well, but those are — but those are choice of form clauses. They're not choice of law clauses.  But what happens — The Second Circuit rule. We know what happens in arbitration in New York. Arbitrators in New York follow the Second Circuit rule. They tend to follow the Second Circuit rule, although — And certainly — certainly the Southern District of New York is following the Second Circuit rule, isn't it? To be sure. But the — but the flip side of that, first of all, this wasn't litigated in New York. This was litigated in the Third Circuit, and properly so. Well, I know there were some strange circumstances. You know, it didn't end up going to arbitration. But mostly people expect that these kinds of disputes will go to arbitration. And this arbitration clause says you're in New York or you're in London, both of which have a warranty interpretation of this safe birth clause. So even if we're just looking to this particular contract between these two parties, I guess I'm thinking these two parties thought that this was going to be adjudicated in New York under New York rules. But even under — even under that interpretation, which I don't think is a fair way to interpret this, because it seems to me that when you're engaged in a very broad contract entry position, to say that this was — that this was something that was entertained because they knew how New York law worked in certain ways, I don't think is a fair way to interpret the contract. But even aside from that, if you actually look at the arbitration decisions at our friend's time, they say things like, of course the charter is not the insurer against all risk that takes place, so there's at least some reason to doubt that the rule would ever be interpreted as broadly as it is in this context. And so — and that there are others in which the Court has said that strict liability doesn't extend to the ends of the earth. So there are — it's far from clear what that would mean. But what we do know is that the provision specifically says U.S. law. And U.S. law, obviously at this stage, ought to be what this Court decides it ought to be. And again, remember, this is not an agreement between my friends over here and my client. This is an agreement between a third party and my client. And there is no evidence as to what either of them had in mind with respect to this particular issue. So I think what you should look at is the language and the text, and what does that lead you to, and what's the conclusion to take from that. The context that tells you the general exceptions that we're not liable for perils of the sea, nor is anybody else liable. That's what insurance ought to be for. Can I just ask, Mr. Phillips, about the text? Because the text does say a safe berth, yeah? Yes. Safe place or wharf. Right, safe place or wharf. I mean, just thinking about that as — you know, under black-letter rules of contract, which suggests that material statements of fact are indeed warranties. I mean, what would be the difference if I said to you, I'm going to sell you a working car for $1,000, and then I give you the car and it breaks down two minutes later? I mean, would you think that that's anything other than a warranty? No, I would think that that is, in fact, a warranty. But I think that — Even though, like I say, I didn't know that this car was ready to break down. It's unknown and unknowable. I had no idea. Well, my guess is, first of all — I mean, I hate to fight your hypothetical, but my guess is that's something that is at least potentially knowable, although I could envision a circumstance where it wouldn't be. Here you're talking about something that is absolutely unknown and unknowable under these particular circumstances. And the term safe doesn't mean against all possible risk. Or it doesn't have to mean that. It can just mean safe for the ordinary use that you're going to put it to, as the Ocean Victory decision in the U.K. says, which I think is the best way to think about this. Was it safe for that vessel on that day at that place, given what we knew about the characteristics of the port? What if we think the text can be read your way, but it can also be read the other way? What should we do then? Then you should go to the other criteria, which is the context, which I've already identified, and the billion dollars of liability insurance that the other side has. I think the case law tends to support us more. I think Atkins can be read as having rejected exactly the kind of warranty, because there the situation was that one of the parties said to the ship's captain, it's a safe port, and the Court rejected the idea that that was a warranty on its face that you could get in under any circumstances, and regardless of knowledge. Then I think you look at the other two criteria that the Court uses in deciding the right way to interpret admiralty contracts and admiralty. One is, does this promote maritime commerce? And the answer to that seems to be clearly not. We know from the amicus briefs that operate in the Fifth Circuit, those merchants don't routinely get insurance and can't get insurance for a lot of what we're talking about here, and it would completely disrupt all of the commerce that goes into the Gulf under these circumstances. Well, if we get to custom and usage, which is what you seem to be talking about, can that be decided on the record that we have? Isn't that a factual question, and was that fact decided by the district court? No, well, it wasn't decided by the district court, because the Court of Appeals in its prior opinion had basically said this is a strict liability to the limits of the earth holding, and therefore there was no opportunity for the district court to entertain that. On the other hand, what we do know in terms of transactional costs and insurance I think is probably knowable from common sense. I don't know that it's necessarily a triable fact. I mean, this Court has in the past examined whether or not a particular rule is going to adversely affect maritime commerce, and it seems to me that any rule that exposes a defendant to limitless liability interferes with maritime commerce and efficient maritime commerce. Along those lines, Mr. Phillips, I'm trying to figure out the difference between your rule and your colleague's suggested rule. As I understand it, you would like us to essentially impose a negligence standard, due diligence standard. We couldn't have known that the anchor was there in the river when we hit it, and therefore we shouldn't be liable. The other side says, no, there's a warranty of safe berth, but at least as it's been interpreted by many courts, including the English Court you alluded to earlier, there's an exception for abnormal circumstances under the particular circumstances. I think you alluded to it as well in these circumstances at this time and this place. It seems to me that those two rules, strict liability minus abnormal circumstances and negligence, are awfully close at the end of the day. And is that true? First of all, would you agree with that? And isn't your real problem, at least the argument from the other side, that you didn't make an abnormal circumstances argument below? And so that you are stuck with more of a strict liability result in this case, but might not have been on a different record in different circumstances. The answer to your question, Justice Gorsuch, is that we did make an abnormal occurrence argument. And if you look at the reply brief in our footnote, we devote an entire footnote to the six times that we referred to abnormal circumstances. And again, put it in the context of the litigation, which is the district court had held that we were not liable under these circumstances. And the Court of Appeals says, well, we're just going to decide some legal issues here. And now you lose on that legal issue. So the opportunity to try to parse out the nuance of what you've just described wasn't available to us. But we certainly posed at every stage that argument. So if you wanted to remand for that issue, if you vacate the decision and send it back to, is this a peril of the sea, or is this a natural occurrence? I got you, Mr. Phelps. So I guess let's get away from the specifics of this case, though I know they're very near and dear to you and your client. What's the difference between those two legal rules, if any? The due diligence standard, frankly, doesn't go, to my mind, to the question of this particular obstruction. The due diligence goes to the question of whether you did due diligence in selecting the port or the berth in the first instance. And that's usually regulated on the basis of the history of the port. And again, if you look at the original district court opinion that talks about the 147 ships, just like this one, that passed through exactly that stretch, there's no question this was a safe port when selected under those circumstances.  You've been using terms like strict liability and due diligence, and those sound in tort to me, and yet we're dealing with a contract. The contract doesn't say anything like that, any familiar tort terms. It just says you're going to provide a safe place. And you either did or you didn't. But that's a matter of contract. I don't know. It seems to be introducing, you seem to be introducing these tort concepts into a contract case. I'm not sure I'm the one who's introduced them into the contract case. I think the lower courts, frankly, are the ones who've decided that the better way to conceptualize the problem is in these terms. From my perspective, I'm perfectly comfortable if the question is, is this a safe port? There was no breach of the contract, because this, of course, was a safe port. Ships had gone in and out of there for years and years and years, and what we faced was an unknown, an unknowable obstacle that caused this particular elision. So the question that Justice Gorsuch, to go back to Justice Gorsuch's question, what do you do in that circumstance, is you say, who should be liable under this? Well, but it's not a safe port. What made it unsafe, as you say, was something that was unknown and unknowable. But it's still a question of contract law. Right. But the question is, did the parties envision that for something that was unknown and unknowable, that one of the parties would — that that made it unsafe under those circumstances? Or isn't it the more logical conclusion to draw, particularly in the context of a provision that says that there is no responsibility, and does it in terms of damages, for losses that are — that are caused by perils of the sea? Under the contract, and separating out tort law and contract law, under tort law, it happens because there is an accident, and it's classic terms, it's unknown and unknowable. Right. Under contract law, why should the vessel bear the risk of someone else's choice? Because of the unknown and unknowable. The voyage is — the vessel is there only because of the charterer's choice, not because of its own. Right. And so if we're talking in terms of contract, why does that make any sense to view it in any other way than to say the charterer picks, the charterer has the expense, risk, and peril of literage, and literage, in my mind, can include all the charges related to the transfer to a safe berth. There was no ability to do that. It just was destroyed there. So I'm — I'm just not quite sure you're — you were answering the Chief's question. Well, I — Which is, if you're talking about the party's expectations, why would the vessel think it should be responsible for losses occasioned by someone else's choice? Because all that the choice imposed as an obligation on my client was to identify someplace that is safe in the sense that there are no obvious risks, that it is not obviously unaccountable. I don't see those words anywhere in the contract. Well, but it only makes sense in the context of what is the remedy by choosing poorly. It's not, as you would get in dealing with the General Exceptions Clause, which says they'd be responsible for any loss or damage resulting from the perils of the sea. If you were going to say that you are responsible for everything, you would use precisely that same language. And if you depart from there, then you are responsible for any loss or damages arising from the choice made by the — by the charterer. The fact that they don't use that language suggests that this is a much narrower obligation. And the reason why you would interpret it in light of that is, again, goes back to the core notions of maritime commerce, that any time you begin to impose virtually limitless liability on a party who has no ability to make a choice, and you do so in a way that we know from our amicus will dash the expectations of a very large part of the economy that operates in the Gulf of Mexico, this Court ought to think long and hard about whether that's the more sensible rule and adopt the more — the more restrained rule, and realize that at the end of the day, the reason why the — the ship owner would expect this liability to be on it is twofold. One, it took out insurance. It has a billion dollars of insurance against the ultimate liability here. And two, it almost certainly had insurance for its whole. And that's — that is exactly the position that — that Gilmour and Black explained many, many years ago as to the — as to the reason why it's not reasonable to expect that the ship owner thinks he's getting a pass on that circumstance, and it is certainly not reasonable to think that the charterer under these circumstances would assume that kind of liability. Back to the text, it does say, safe place or wharf, which shall be designated and procured by the charterer. So the words designated and procured are not just the place, but the fact that it's safe as well. So if it turns out not to be safe, just as a matter of logic, it hasn't designated or procured a safe place or wharf. Well, the question — it seems to me the question, Justice Kavanaugh, really is, does safe mean that you — that you will assure that regardless of what happens, if it gets hit by a meteor, if it gets — if somebody — a vandal goes on the — on the ship while it's in a berth and blows it up, that that's all on the charter. Did the charterer assume all of those obligations? It says designated or procured — and procured a safe place, and it doesn't say usually safe place. If it turns out not to be safe, then — I mean, I do think that's one interpretation you can give to it. The other interpretation, which is much more sensible in terms of maritime commerce and the rest of the provisions and the other protections that the other parties have against this particular liability, is to say it's safe in the way the U.K. Supreme Court said. It's safe for this ship under these circumstances on that particular day as a prediction made at the time that the prediction is made. And there's no question we satisfied that standard under these circumstances. We knew — and the record's very clear about this in 342, 343 of the appendix to the petition hundreds of ships of the same size and dimensions of this one had passed right there — right through there, completely safe. Kagan. Mr. Phillips, what you're saying is sensible seems to be doing a lot of the work there in contrast to the language that Justice Kavanaugh read. And again, this goes back to the question of what you're supposed to do in tort and what you're supposed to do in contract. I always thought that the contract rule is that you view as sensible whatever the parties chose, that there's not — you know, courts are not here to decide what's sensible or what's efficient. If the parties chose something, that's by definition sensible and efficient. I don't — I mean, obviously, in the abstract, I don't disagree with that proposition. The question is, was this language meant to carry as much water as the other side would ask it to carry? And again, I would go back to the other language, the exceptions clause, which talks about Unless otherwise in this charter expressly exempted, they shall not be responsible for any loss arising out of the peril of the sea. It doesn't seem to me under those circumstances that this — that the provision on the safe berth envisions that we are taking on the responsibility for everything that can happen that would be a peril of the sea or that would be an abnormal occurrence. I would say that the Court ought to draw that line. And whether it draws that line as a matter of due diligence and tort concepts or whether it draws that line as a better way to read this particular contract, I'm perfectly comfortable with that. And even if the Court thinks that there ought to be a remand to determine whether this was an abnormal occurrence or whether this was a peril of the sea, that would be fine, too, because the answer to the question is, this is clearly a peril of the sea. This Court said as much in GR Booth already. And is this an abnormal occurrence? The idea of a 10-ton anchor that leaps, flukes up, catches this ship, flukes down again, that is not only an abnormal occurrence, and this is a bad pun, but that is maybe the flukiest outcome imaginable. I knew I'd get somebody. If there are no further questions, I'll reserve the balance of my time, Your Honor. Thank you, counsel. Ms. Ross. Mr. Chief Justice, and may it please the Court. The sophisticated commercial parties in this case chose a forum contract to govern the transport of oil from Venezuela to Petitioner's berth on the Delaware River. When the parties entered their agreement in 2004, they had the choice of two types of safe berth clauses that predominate within the industry. As this Court's already recognized this morning, some contracts include a traditional safe berth clause, which gives the charterer the right to designate the port, but requires that the charterer choose a port that is safe. In stark contrast, other contracts include a more limited clause, which expressly provides that the charterer will not be liable so long as it exercises due diligence in selecting the port, or expressly disclaims a warranty of safety. The parties here chose the first traditional type of clause, which lacks any due diligence language. By the time they had done so, courts, arbitrators, and scholars on both sides of the Atlantic had for decades construed the safe berth clause as a warranty that the charterer would choose a port that is actually safe, not merely one that the charterer believes to be safe after the exercise of due diligence. Mr. Ross, I'm going to pose to you the same sort of question I posed to Mr. Phillips, which is I'm not sure what the difference or delta is between the two proposed tests at the end of the day. Yes, this is a contract case, but Mr. Phillips has argued for something like a due diligence, right? I think of it as really a negligence-type standard. You've argued for something more like strict liability, right, that is a warranty, absolute. But you've also recognized, at least in passing, that there's an exception to that Nobody knows what that is. At the end of the day, don't the two wind up in pretty much the same place? And if they do, my question for you is, given the difficulty of knowing what an abnormal circumstance is and how atextual that would be in this contract, which speaks only of a guarantee of safe berth, why shouldn't we adopt the petitioner's  So, Justice Gorsuch, I disagree that they wind up in the same place. I also disagree that petitioners have preserved an abnormal occurrence argument. And I think it's very important here. Your Honor used the phrase abnormal characteristic. It's actually an abnormal occurrence under the – well, it matters because the way that abnormal occurrence is defined in the English cases, which have done the bulk of the work in this area, is it is something from outside the port. It is not a prevailing characteristic of the port. It's something from outside the port that comes in and causes an abnormal event. And it's not the accident itself that has to be abnormal. It's that cause of the accident. Like what? So, for example, there's an old – so, Mr. Phillips mentioned a meteor. I think that's exactly the example that the Sir Bernard Eder amicus brief gives. That's – he's a well-known English judge and scholar on this topic, so that might be an example. There's an English case called the Evia from the 1980s, where when the parties selected the port, everything was well and good. Everything was fine. Turns out the Iran-Iraq War breaks out, and the ship gets stuck in the port. That has nothing to do with the characteristics of the port. It's an entirely external event. Well, the U.K. Supreme Court has recently just held, though, that a big storm that sweeps into the port also counts as an abnormal occurrence, if you want, though that surely – those types of storms have not been unknown to that port in the past. They're rare, but they happen. So whether or not the abnormal occurrence situation applies here, again, given the difficulty of knowing what that is and the fact that we might have to just more or less make that up as we go, why isn't Mr. Phillips' test more reasonable? So I think the fact, Your Honor, I agree that a large weather event could be an abnormal occurrence. I don't think that that actually changes, that the abnormal occurrence doctrine doesn't apply here. Now, as I mentioned earlier, Petitioners didn't preserve this argument below when they used abnormal occurrence. They were saying something very different in the context. But nonetheless, there is evidence in the record that debris of this sort on the floor of the Delaware River is not anywhere near abnormal, given the fact that it's an industrial river. I know you're liking to focus on the facts of the case just as much as Mr. Phillips, and for that I admire you. But if we could just back up, move up one level of generality for me, okay? Sure. The two legal rules. You're the judge. You have to pick between these two legal rules. Again, why not Mr. Phillips on at least administrability grounds? So, I mean, I'm happy to get to administrability grounds, but I think the number one reason would be that's not what the text of the contract says, and it's not The text of the contract also doesn't have abnormal occurrence in it, right? So you're arguing for an atextual position yourself, I think. And if that's where we're at, then last shot.  Are you arguing for that position, Mr. Ross? So we're not saying that the abnormal occurrence possibility does not exist, but I don't think it's atextual, and if the Court will just bear with me. I think that is one example of a set of doctrines that have grown up around this clause that show that this clause has a long lineage, but also are just sort of applications of causation principles. If there is an abnormal occurrence, Petitioner's failure to designate a safe birth is not the cause of the vessel's injury. Now, that is also true of the bad navigation and seamanship doctrine. It's also true of the waiver-type named port exception doctrine that came up in the district court's decision in Atkins. Now, putting all that to one side, to get back to Justice Gorsuch's administrability question, I do think that this is quite administrable, and the way that we know that is that this has been the rule in the vast majority of jurisdictions for, dating back to England, 1861, Ogden v. Graham, the first case anyone can find on a safe birth clause, actually involves a situation in which the Court says it is possible that the charters were perfectly innocent as to this danger and they are still liable. So we know that it's administrable because parties have continued to choose this contract for 150 years since that decision. Now, going to another point on administrability, my friend pointed out that the law has changed in the Fifth Circuit for the last 30 years. That, too, we think is insufficient to change the weight of authority here, and that's because, again, we have one Fifth Circuit decision against 150 years of English law, cases from the Second Circuit, including Judge Friendly's opinion in Paragon Oil, beginning in the 1930s. The Association of Ship Brokers and Agents publishes the form on which this contract was based, doesn't it? It does, Your Honor. And which interpretation does it think is the correct one? So it has not taken a position in this case. At the cert stage, it simply asked the Court to grant and didn't say which side. I think it does, however, take a position sort of without taking a position by having a separate form contract that was promulgated in 1984, so 6 years before the Fifth Circuit's decision in Ardugna and 20 years before the parties here contracted. That's known as the ASBA II. And that ---- Well, I think it's done more than not take a position. It says it would be entirely rational to construe a safe birth clause to impose an absolute warranty. It also would be entirely rational to construe a safe birth clause to impose only a due diligence obligation. So if it doesn't know which is the right interpretation of this clause which it is offering to the public, how can you say that it's clear? So I think it's clear for the same reason that Judge Friendly said it was clear in Paragon Oil. As he said, a simple set of propositions was sufficient to resolve the case. A safe birth was warranted. It was not provided. Therefore, the warrantor is liable. I think the language actually is quite clear. But even if you disagreed with me on that, I think you would look to other contracts. I think it's simply implausible that a sophisticated commercial entity like CITCO didn't know that there were other contracts, including one from the ASBA itself, promulgated again in 1984. They expressly ---- But there is a lot of authority both ways on this, on this issue. Is there not? There is not, Justice Alito. I really would resist that impulse. Well, there's the Gilmore and Black Treatise, which is we have long regarded as one of the leading, if not the leading, admiralty treatises. Isn't that correct? So that's correct, Your Honor. But what Gilmore and Black actually says, and it's important to note that Gilmore and Black are writing in 1975, but what they say is that at that time there were many authorities that construed this as a warranty. So they're not debating what the state of the law was. They're simply saying on policy grounds that they disagree with that. And they, like my friend, say that, in fact, you should require very clear language to have a safe birth clause that actually functions as a warranty. But there's no basis for that in contract law, as I believe Justice Kagan was pointing out earlier. There's no basis for that. They don't purport to provide any basis for that, either in the language of the contract or in background principles. You mentioned some time ago that it's not abnormal to have debris in the Delaware River, the Delaware River. Yes, Your Honor. Is that what we look at? Or do we look at the actual event, which is, you know, the anchor leaps up from the bottom, you know, damages the hull, then returns to the bottom? I mean, that's a pretty abnormal occurrence, even if there are a lot of anchors. So it's possible, Your Honor, that some court might, with actual evidence about that question, decide that that is an abnormal occurrence. I don't think that's correct. I think you would look at the presence of large debris on the floor of the river and one question you would have to ask is, even without the leaping up, so to speak, how much of that debris sits that high above the river? And all of this, or the riverbed, all of this goes to the fact that, as I was saying earlier, there's no evidence on this question because Petitioners did not raise it. This case has gone through two trials with a total of 71 days of testimony. I think the idea that at this point Petitioners would come in and raise, in their reply brief, no less, this idea of an abnormal occurrence and then this Court would remand would be quite surprising. You earlier mentioned causation principles. Can you tell us how you would phrase the causation principle that applies to these circumstances? To the abnormal occurrence? Uh-huh. So, Justice Kavanaugh, I mean the line of causation. Is it damage caused by the condition of the port, for example? Yes. I mean, I think, roughly speaking, that's probably correct. What Petitioners have warranted is a safe port. They actually don't disagree, at least in their brief, with the definition of safe. It's on page 19 of their brief. And that means that when they fail to provide a safe port, if the characteristics of that port have caused the damage, then they are liable. And if it's weather or a meteor, obviously that's not the condition of the port. I guess people could argue about the things on the floor of the Delaware River though. Well, I think people would argue about weather just in terms of how frequent that type of a storm is and things of that nature. But putting that to one side, I don't think that you would, again, I think based on the limited evidence we have here and common sense, I don't think that the presence of debris on an industrial river would be in the same vein as a meteor or the outbreak of a war or something of that nature. And that is where we see, or a sort of once-in-a-generation storm even. I mean, you think we can sort of take judicial notice of the fact that an anchor popping up like this in a port that is very heavily used is more foreseeable than a big storm? So, Your Honor, my suggestion, if I were to be sort of bold enough to make one, would be that the Court not address this particular question at all because Petitioners haven't preserved it. And so I think it would be perfectly appropriate for the Court to say in a different case where Petitioners had not gone through two trials and failed to ever raise this question, it might be appropriate for a United States court to consider the scope of the abnormal occurrence doctrine, but that that's not this case. You referred to the fact that it's the London courts that have done the work on this. Mm-hmm. Has the Second Circuit or any of the New York arbitrators, do they recognize this doctrine or not? So, Justice Kagan, to my knowledge, there are statements, including in the Third Circuit's opinion here, that sort of acknowledge that the safety definition includes a carve-out for abnormal weather or other occurrences is usually how it's phrased in the American cases. I'm not aware of an American case that actually applies it, or an American arbitration for that matter that actually applies it. The arbitration point, if I might, it just loops back to something that we were briefly discussing earlier. Mr. Phillips relies on the Fifth Circuit's decision in Arduino as sort of a sea change, so to speak. The – I think that that's incorrect, not only because we think it's sort of too little too late and it's poorly reasoned, but also because in following Arduino itself, petitioners have not pointed to any case that has actually applied the rule of Arduino, nor have they pointed to any arbitration. Now, they say that, well, the Maritime Arbitration Society in Houston doesn't publish its decisions. We also are not aware of, and they have not put forth, a single arbitration clause that would send arbitration to the Fifth Circuit. So if you look at the New York arbitration, some of them, in fact, involve accidents that occurred in New Orleans. And they, because of the standard forms that Justice Kagan was discussing earlier, they still wind up in New York arbitration. And so we don't know. Alito, I mean, arbitrators don't have to interpret the law the same way a court does, and to the extent they do it, it's not reviewable by a court. So how much can we read into arbitration decisions? So, Justice Alito, I certainly take the point that arbitrators may not be bound in the same way that lower courts would be. I think where you have a situation – although, actually, in the Second Circuit there is a case overturning an arbitrator's decision for failing to follow Second Circuit law and following other courts. I take the point that this Court might not agree with that decision. But I think when you have a case like this one, where you have 67 arbitrations on one side of the ledger and zero on the other, you don't actually need to decide these sort of more difficult edge cases about what would happen if it were closer or if you really had a question as to what law the arbitrators were applying. It's quite clear in these, again, reported, well-reasoned, quite predictable after, you know, the first 20 or so arbitration decisions. I don't know. So I'd be very nervous about saying that we should interpret the law in accordance with a body of arbitral decisions, having read a fair number of arbitral decisions and seen how they treat the law. So I think, Justice Alito, the way I would phrase it, if I might, is that the arbitration decisions are really confirmation of the industry's understanding, because these are expert arbitrators. And again, going back to where I started this morning, the industry had and has had, I believe, since the 1950s, two sort of standard form contracts that govern, and so it is consistent with that dichotomy between express prediligence. Sotomayor, with respect to that issue, you're at Mr. Phillips says that you can't get insurance, that a ruling in your favor will destroy the industry. Could you address that issue? If I might. Yes. Sure. So I don't think that's correct. I don't think they have any evidence for that. I think on the insurance point, two points are really important here. One is that the reason why vessel owners have that insurance is because the Oil Pollution Act requires it, because they're the statutory responsible parties. It's not specific to this contract. The second is that their amici suggest that charterers can't get insurance. I think there's plenty of evidence in the red brief and in some of our amicus briefs that that's just not true. So I don't think that that should be driving the decision here. Thank you. Thank you, counsel. Mr. Goldstein. Thank you, Mr. Chief Justice. And may it please the Court. I thought I would come at this from the perspective that Justice Alito asked about what if we regard the text as an equipoise. It says safe, and that could mean different things in different contexts. And I'd ask the Court to just look at what the position of the parties was at the time they entered into this agreement. So at the time that they did this, it wasn't just you had to interpret safe, port. There were two different kinds of forms, and they were basically evenly divided. This is all done by an industry that they just choose forms off the shelf, and there are a bunch that say safe, port, and there are a bunch that say the charterer will exercise due diligence in selecting a safe, port. And so that's a pretty meaningful choice. Then you say, okay, with respect to the ones that say safe, port, what was the understanding of the industry at the time? Now, every one of those forms said that any dispute will be resolved by arbitration in either New York or London. There were none for Houston. So every single one of them said, we'll go to New York or London. And you say, okay, how were these provisions interpreted in London and New York? Well, they were uniformly interpreted, the safe, port provisions, as importing a warranty. So there were 67, as my friend mentioned, from expert arbitrators in New York. That would include four on this particular form, not just in general, but this specific form. Every decision of the Second Circuit, Justice Kagan cited a provision of the Charter Party in particular that deals with lost cargo. So when the oil spilled out of the oil tanker into the Delaware River, that would be a lost cargo claim, and that was going to be done in the Southern District of New York. And then all of the London decisions, all of the U.K. courts, and unlike U.S. arbitrations, U.K. arbitrations do get reviewed by the courts, and there was absolute uniform authority. So if you just ask, ah, I'm just not sure exactly how I would look at these words, I do think it's quite clear how the industry would look at these words. Then I wanted to turn, if I could, to Justice Gorsuch's question about, okay, you know, what really is the difference here? I do think the critical textual difference is between whether the injury is caused by the port or by some other thing. Justice Kavanaugh, this is the question of causation. And so if it is a characteristic of the port, and I would also encourage the Court to look at the phrase, always safely afloat. There are two parts to this provision. And what they cite, the authorities, they're quite right, that says always safely afloat means you're not going to hit something on the bottom. And that's the kind of obstruction that you have with an anchor, whether it flips up or down, it is on the bottom. And that is a very common thing. It is the kind of thing that you worry about in chartering a ship. Now, some, then you ask, okay, was this a characteristic of the port or something else that caused the injury? Well, what other things might happen? You could have negligence of the ship's master. That could be a superseding cause. The ship's master should have been aware of an obstruction on the floor. It should have been aware of different things that were in the way, other ships and the like. Or you can have just a superseding cause that is not negligence. It is not the characteristic of the port. But it is truly some abnormal occurrence. Now, this is a relatively undeveloped area of the law. It is, though, intended to be very much the exception, not the rule. And so it's not just a storm, but it is a 150-year storm combined with long waves. And in that situation, the courts have said, well, maybe that isn't a condition of the port. But we are unaware of any authority ever indicating that something that is on the floor of the port is not a characteristic of the port. You're worried about running aground. You naturally are accounting for the things that are on the bottom. Who is responsible for negligence of the master? Is the master an employee of the ship's owner? Yes. So if the master is negligent, then the charter is not responsible. Yes. And then so what we have is a situation where the master is negligent and the charter is not responsible. But where the master isn't negligent, then suddenly the charter is responsible. It's not suddenly. That's what they've bargained for. It's a condition of the port. Why would somebody do it that way? Well, here's the little bit of the bait and switch, if I can say. And that is, my friend is very concerned that someone would be held liable without fault. And he's very concerned that $140 million might turn on this. He's not actually concerned about that. He just wants it to be us. Right? He's not saying that there shouldn't be strict liability. He's saying it should be we're strictly liable. Yeah, yeah, yeah. No, well, they still go back to the original thing. There's a master who's hired by the owner. And he says, I'm going to take it into Port X. And he should know that Port X is filled with poison ivy, which drives the crew wild. Or some odd thing about it. That would be us. He's supposed to know that. Yes. And then, when he does that incorrectly, mistakenly, that's your problem. It's the owner's problem. Yes. That's Atkins. That's the district court ruling. All right. But the owner, the master, had nothing to do with it. It's just a total fluke, leaving out that other. Right. And suddenly, the charter is liable. I guess people have operated under this rule, as you say, for a long time. A long time. Well, isn't it because the charterer chose the port? Yes. So that's exactly right. Who? If you asked me, he did. The charterer did. He said, I want to take your ship. You have a ship. I want it to go to Paulsboro. And I promise it'll be safe. And we said, OK, let's go. But that is not at all irrational or strange or anything. And if he instead wanted to say, look, I want to go to Paulsboro. But all I'm promising is that I've exercised due diligence. I've done my best. I'm not taking responsibility. We have to realize, when you have a situation of unknown and not reasonably knowable damages, someone is going to be strictly liable. It is inevitable. We're just trying to figure out who it is. Our point is, he wrote a contract. He picked the contract. And the contract said, it'll be safe, rather than the contract saying. Did Gilmore and Black think that the language is ambiguous? Is that why they recommended the other? Well, let's just be clear. Gilmore and Black written some 40-some years ago. That's right. Pretty good. And as my colleague from the Solicitor General's office says, what Gilmore and Black says is, we recognize that all the authority is on the other side. We just think we would read it differently. We would apply a higher bar. Because? Because we just think it doesn't make sense. Again, it doesn't make sense in their view because? Because it's not fair to the charterer. You should just put it on. Because? It doesn't go a lot farther than that, Justice Breyer. Well, Gilmore and Black are not. I mean, they're very good experts. They were. They don't make things up. Justice Breyer, they actually, in this instance, say they are making it up. Just to be clear. They recognize that the authority says one thing. The Court tends to look to treatises to describe the state of the law. If you asked Gilmore and Black in 1975 and 1977 what the state of the law was, they would say, the state of the law is that the Respondents are right. And then you would ask them, with the exception of the Fifth Circuit's decision in Orduña, which is a complete fluke. Remember, all the forms say that these things will be litigated and arbitrated in New York and London. Sometimes it escapes those jurisdictions because some third party who's not a party to the contract, like the crane operator in the port in Orduña, gets involved in the litigation. But were it not for that, Orduña would not even have existed. And the reason Orduña has not been a problem, the reason it has not been a problem and has not been regarded as a lot of authority on either side, is that in the wake of Orduña, all these contracts still call for arbitration and litigation in New York and London. That's why there are no follow-on decisions. I knew Gilmore and Black in 1975, and I should have asked them. Yes. For foresight. I didn't. That's it. Ask them about the poison ivy. Yeah. Mr. Goldstein, would it be fair to say Gilmore and Black were incredibly smart men? There are two kinds of treatises in the world. There's the kind of treatise that just sets out the law, and there's the kind of treatise that says we are incredibly smart men and we could do it better. Yes. Don't you think Gilmore and Black is the second kind of treatise? I do. Yeah. And they, in fact, say it themselves. And I'm sure they appreciated all the citations of the court. But if you were to actually cite them in your opinion, you would be citing, Gilmore and Black says the rule should be X. My point, I was trying to start from Justice Alito's question, is what actually if you thought the text was an equipoise, what would you look at how the industry actually treats things? You would not cite Gilmore and Black against me on that position, on that question. Well, if we thought that the text was perfectly ambiguous, couldn't we say we are incredibly smart people and we think that the better rule is the Gilmore and Black rule? Justice Alito, I learned a long time ago that if the question is couldn't, could the Supreme Court do X, the answer is yes. It would be somewhat of a departure from this Court's decisions saying that you, in these kinds of cases, look to two things, and that is the industry practice and how the United Kingdom has interpreted maritime contracts. And so while you could depart from that understanding, it would not be in a contract case what the parties actually expect, because it is the case that they can get what they want. And so if we cited the insurance policies in our brief, it would be very strange if the insurance industry said, we recognize to the charterers you're undertaking this liability, but we just don't like to give you insurance. We'll give the ship owner the exact same insurance for the same liability, but for the charterers, we just don't like charterers. That's not true. It doesn't make any sense. And it would be contrary to the fact that this has been the industry's understanding for a long time. I did want to explain the literage provision, if I could, which is on 8A. I think what happened here is that my friend inadvertently just skipped some of the language in the contract. And it says at 8A, The vessel shall load and discharge at any safe place or wharf. And then here's the part that gets skipped. Where alongside vessels or liters reachable on her arrival, which shall be designated and procured by the charterer, provided the vessel can proceed thereto, lie at, depart, and therefrom always safely afloat. And we agree that's don't hit the bottom or hit something on the bottom. Any literage being at the expense, risk, and peril of the charterer. The reason there's a reference to the cost of literage is that in the third line, the charterer is allowed to designate literers. They're allowed to say don't go actually to the port, unload onto a ship. On the question of where we get our damages, there is a damages provision in the contract. And it is at 20A. It's very simple. Paragraph 23, damages for breach of this charter shall include all provable damages and all costs of suit and attorney's fees incurred in any action here under. They promised us a safe port. It was not safe. It was a bad accident. But if you were to ask where is the textual basis for his position, where is there a reference in the Safe Port Clause to due diligence? Where is there a reference to the idea that there will be no responsibility if the port turns out not to be safe and only if they are negligent? It doesn't exist. And just the last point, Justice Gorsuch, on administrability, remember there's always going to be a question of causation. And they agree that they're liable if they didn't exercise due diligence. So it's not that their rule just avoids those questions. It just points them at you, just puts the burden on another party. Thank you. Roberts. Thank you, counsel. Five minutes, Mr. Phillips. Phillips. Thank you, Mr. Chief Justice. And again, may it please the Court. First of all, both of my friends refer specifically to these two forms. There's not a shred of evidence in this case that any form other than the one that was actually implemented in this case was ever considered by the parties. And indeed, one of the parties has never been in this litigation. So the notion that you should construe what the meaning to these parties were with the language of the contract on the basis of a different contract that we have no idea whether it had any input whatsoever into this case seems to me. Those other contracts were not a mystery. They were well known in the trade. You could pick the safe berth or you could pick the due diligence. You may have had to be sure, Justice Ginsburg, they had the option to do that if they knew about that option. But there's, again, typically in a contract case, there's some evidence that between the contracting parties that tells you who did what to whom and who made the selections here. All I'm saying is the fact that there are other alternatives does not tell you anything about the contract that the parties understood when they entered into this agreement. With respect to abnormal occurrence, again, that is clearly an atextual analysis, again, by my friends over here. There is no way you can get from the simple language of just safe berth and say, but that excludes abnormal occurrence. You only do that because at the end of the day, that is the most sensible way to read safe berth, which is to say it doesn't make you the insurer against all things that can happen. And I submit to you that if you're not the insurer against all bad things that happen, one of the bad things that you're not insuring against is the anchor in this particular case. It is not a characteristic of this Court. This Court specifically defined objects in the sea, submerged objects in the sea that are unknown and unknowable as perils of the sea, not as characteristics of the port. The Court's already been down this road. It ought to follow that same position that it took in GR Booth. And then finally, with respect to Gilmore and Black, what they say is the text is being way overread by the prior decisions. All of those decisions ignore this Court's statement in Atkins that this cannot fairly be immediately assumed to operate as a warranty. And finally, what they said as a matter of both policy and maritime commerce concerns is that the Charter is in the least effective position to prevent the injuries that will arise under these circumstances. And it makes no sense to put it on the backs of the party least capable of dealing with the problem because it creates insurance risks, it imposes unlimited potential liability, which this Court has consistently recognized. I'm not saying that this all should fall on Mr. Goldstein's client. Mr. Goldstein, if determined today, if this Court were to decide today that there's no liability for CITGO, he can go back to the federal government and seek complete exoneration because the third party here, the person who left the party least capable of dealing with the problem, that's the person who should be liable. We can't find that person. There are two ways to deal with that. There's exoneration for him completely because of that third party, and there's the oil spill fund, which would take care of it. My client's already spent more than $100 million on that fund. It should not be, it is not an equitable result to impose another $140 million solely on the party least capable of avoiding this particular problem. If there are no other questions, I would urge you to reverse your honors. Thank you, Counsel. The case is submitted.